FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 00 APR 21 P.. 2..
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

SHERRY E. BELTON,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )    Case No. CV-97-TMP-1651-S
                                     )
THE UNIVERSITY OF ALABAMA            )
AT BIRMINGHAM, and the               )    ENTERED
UNIVERSITY OF ALABAMA HEALTH         )
SERVICES FOUNDATION,                 )    APR 21 2000
                                     )
            Defendants.              )

## MEMORANDUM OPINION

This cause is before the court on the motions for summary

judgment filed on December 15, 1999, by the defendants, the

University of Alabama Health Services Foundation ("UAHSF") and the

Board of Trustees of the University of Alabama at Birmingham

("UAB").   Essentially, defendants seek dismissal of all of

plaintiff's claims of race discrimination[1] and retaliatory

discharge.   This matter has been fully briefed and the court has

considered the evidence and the arguments set forth by all parties.

The parties have consented to the exercise of jurisdiction by the

---

[1]    The plaintiff has agreed to voluntarily dismiss all
race discrimination claims and to proceed solely on the basis of
her retaliatory discharge claim.

undersigned pursuant to 28 U.S.C. § 636(c); accordingly, the court enters this memorandum opinion.

## I.  FACTS

The following facts relevant to summary judgment in this case are undisputed:

Sherry Belton, the plaintiff, worked for defendant UAB as a temporary clerical employee from September of 1995 until October of 1996.  While working as a "temp," Belton expressed an interest in a full-time clerical position with UAB in the Department of Pediatrics Administration.  To discuss that position, Belton met with Eileen Jenkins in August of 1996, although she never formally applied or interviewed for the position.  The parties have widely disparate accounts of the conversation that took place between Belton and Jenkins, but on the basis of that encounter, Belton filed an EEOC charge against UAB in September of 1996, alleging that Jenkins, a black female, told Belton that she would not even consider an African American for the vacancy.[2]

---

[2]     The positions for which Jenkins was hiring ultimately were filled by African American applicants.

Also during September of 1996, Belton formally applied with UAHSF for a full-time clerical position in the Infectious Diseases Division of the Department of Pediatrics ("the Department").   She had performed some of the duties of that job during her service as a "temp."  Sharon Fowler, a UAB employee working in the Department, and Dr. Robert Pass, Director of Infectious Diseases, who was an employee of both UAB and UAHSF, conducted the interview with Belton.  Paul Orr, the Executive Administrator of the Department of Pediatrics, was ultimately responsible for the hiring and firing of Department employees.  Orr is an employee of both UAB and UAHSF. At the time Belton was interviewed, both Fowler and Orr knew that Belton had filed an EEOC charge against UAB.[3]

After the interview, Belton was offered the job, and she accepted.  Belton became an UAHSF employee on October 13, 1996. Her job duties were clerical, working in the mornings as a data entry clerk and in the afternoons as a financial assistant.  She also was sometimes required to answer phones and run office errands.

_____

[3]     It is unclear whether Pass learned of Belton's EEOC charge before or after Belton was hired by UAHSF.

3

Her immediate supervisor was UAB's Fowler, who oversaw the financial work. She also reported to Dale Alosi, a UAHSF employee, who oversaw the data entry work. Pass ranked above Fowler and Alosi in the chain of command, and Orr retained ultimate responsibility for the Department personnel. In accordance with UAHSF practices, Belton was placed on probation for the first six months of her employment, during which time she understood that her employment could be terminated "for any reason."

As early as five weeks after she began working as a full-time UAHSF employee, Belton was called into the first of a series of meetings about her job duties and her performance. The parties dispute whether the meetings were routine discussions of duties or were prompted by problems with Belton's job performance. Belton generally asserts that the criticisms of her performance reflected racial animus (a charge no longer asserted) or defendants' desire to retaliate against her. The documents detailing these meetings, however, show the following:[4]

**November 20, 1996:** Fowler met with Belton to discuss job progress and goals, setting forth the specific duties Fowler

---

[4]      Belton has not disputed that the documents accurately reflect the content and nature of the meetings.

expected Belton to perform.  Fowler also discussed with Belton (1) the key to the mailbox that Belton had lost, (2) Belton's loud singing or radio-playing while at work, and (3) a dispute with co-worker Dana Pinson over the supply of fax forms.  Belton's comments included a statement that the music wasn't loud or distracting to her, and that she found it distracting when co-workers would put trash in her garbage can, converse in her area of the office, or ask for supplies.

**December 6, 1996:**  Fowler met with Belton and reported that she had found numerous misfiled requisitions.  Belton was told that she was responsible for accurately filing the documents.  Fowler also indicated that requests for time off needed to be submitted in writing.  Apparently in response to Belton's complaints about having to answer the phones, Fowler relaxed Belton's phone duties and required Belton to be responsible for telephone coverage only as needed as a "back-up" to the secretaries.

**January 10, 1997:**  Fowler sent a memo to Anita Clemon, a human resources specialist for the Department of Pediatrics and a UAB employee, stating:

> During the past three months, I have monitored Ms. Belton's performance, and have come to the conclusion

5

> that she is not suited for this position.  Her progress
> has not expanded at the rate expected or needed in our
> division, in fact, her productivity has decreased.  I
> have detected numerous mistakes in her work, a decline in
> her spirit of cooperation, and at times an inability to
> focus on the task at hand.
>
> Because Ms. Belton is unable to meet the performance
> criteria, I recommend dismissal of Ms. Belton from this
> position.

Fowler also recommended Belton for a transfer to another UAHSF position that would be "more suitable" to her skills.  In spite of Fowler's recommendation, however, UAHSF decided not to terminate Belton in January.  Instead, supervisors again met with Belton to discuss her performance problems and to provide guidance.

**January 21, 1997:** Clemon met with Belton and Belton complained that Fowler was "on a power kick" and was "trying to get her fired." Belton based this assertion on the fact that Fowler was "really picky" and that in the past Fowler had "never had any complaints about her leaving early" but that Fowler now "wants perfection all of a sudden."  Belton also said that she held Fowler responsible for any misfiled documents.  Clemon noted that Belton told her that in Belton's opinion there were no "performance issues," and that Belton "refuse[d] to accept the blame for certain issues."

6

**January 29, 1997:** An interim employee evaluation was conducted by Fowler, Pass, and Clemon.  The following problems with Belton's performance were documented:

1.    Does not follow directions:
          Example: not completing open and past due
          reports from diagnostic laboratory as
          instructed
          Repeated errors on diagnostic laboratory data entry
          even on items previously instructed
2.    Many errors in serving as financial accounting assistant
      to Sharon Fowler.
          Example: important documents misfiled.
3.    Failed to complete clinic billing sheets for over one
      month.
4.    Lack of cooperative spirit, not working as a member of
      the team.
5.    Often fails to present professional image as a
      representative of our division to others.
          Example: telephone manners, public verbal complaints
          in other offices.

In addition, Belton was given goals of improving the quality and quantity of her work, improving efforts at cooperation, and improving the image she presented to the public.  Belton's duties and hours were even more specifically delineated, and she was relieved of some extra duties of running errands and answering

phones.   She was encouraged to meet with Pass or Clemon if she had any questions, problems, or complaints about her job.[5]

**February 7, 1997:**  Pass and Fowler met with Belton to review Belton's performance from the past week, since Belton's duties had been more carefully "structured."   Belton's work performance was deemed satisfactory by Alosi and by Fowler, although Fowler pointed out "minor" problems of lack of proofreading, misfiling, accuracy, and timeliness.   Another meeting was set for the following week.

**February 13, 1997:**   Belton received a UAHSF Quarterly Performance Evaluation in which her performance was rated "satisfactory" in all areas by Fowler, although each rating was specifically recorded as subject to the memos reflecting the discussions of January 29 and February 7.[6]

In addition to the events described in the documents evidencing formal meetings with Belton, there were other incidents UAHSF claims led to Belton's termination.   While Belton disputes her role in the

---

[5]   Belton has stated that the criticisms of her performance were unwarranted, but she admits she did not express that opinion at the meeting.   She stated that the goals set for her were fair.

[6]   Both Pass and Alosi have stated that they disagree with the ratings and would have deemed her work "unacceptable."

incidents, it is clear that there was office unrest, at which Belton seemed always to be in the middle.  As Alosi put it, Belton "just basically stirred up trouble."

The conduct that UAHSF viewed as "stirring up trouble" are characterized by Belton as evidence of racial animus and retaliation.  Belton has generally complained that she was not allowed to take her lunch hour except during a prescribed time, although other employees had more flexible schedules, and that she was docked for leaving early, when other employees were not.  She also complained that her work area was too busy and noisy, and that Dana Pinson should have to share in the mail-sorting duties.  In response to her complaints, Belton was allowed to swap times with co-workers for lunch, the mail bins and fax machines that caused some of the noise were moved from her area, Pinson was given half of the mail-sorting work, and Fowler agreed to "look into" the docking of her pay.

In March of 1977, Belton also complained about the selection of only a few employees to staff a conference at Orange Beach. Pass, who was in charge of the conference, selected a few clerical employees to work the registration desk.  He did not select Belton.

9

She complained to other black employees that Pass wasn't taking any black employees.  She also discussed this allegation with Clemon.[7]

Another instance that Belton considers discriminatory and that UAHSF considers evidence of Belton's propensity for causing office unrest involved rumors of an office affair.  Pass learned that Belton had spread rumors that Pass was having an affair with a Department employee, Dana Pinson, with whom Belton had experienced conflicts.  Although Belton denies spreading the rumors, she admits that she believed the affair was going on, based on her "woman's intuition."[8]  Other employees testified that Belton often discussed other employees' duties and salaries, and generally promoted office rancor.  For example, in March of 1997, Clemon interviewed a co-

---

[7]     Belton has admitted that she doesn't know the reason for Pass's selection and admits that one of the black employees was not taken because she was pregnant and unable to travel. Nevertheless, plaintiff asserts that her complaint about the conference staffing was a complaint of race discrimination for which the defendants retaliated by firing her.  In her deposition, however, when asked whether Dr. Pass discriminate[d] against her because of her race, Belton answered, "No. Not to my knowledge."

[8]     For purposes of this motion, it is not crucial whether Belton did, in fact, spread the rumors or complain of the conduct.  It is undisputed that the supervisors believed that Belton was at the center of the gossip and complaints and that supervisors were required to expend time and energy addressing the issues arising from Belton's conduct.

worker in the Department, Narissa Winnette, who said that Belton was always trying to "get something on someone" and that Belton created tension in the office.

Finally, Pass and Orr became especially distressed by Belton's conduct with respect to Nancy Culp, an employee who was hired in March of 1997.  Culp was hired to assist with drafting grant applications, based on her experience in that area.  Before Culp began working at the Department, Belton obtained a faxed copy of Culp's employment offer, which included personal information and which detailed Culp's salary.[9]  Two department employees have testified that Belton shared the information from the fax with them. Belton has admitted that she discussed Culp's salary with Winnette, but can't remember discussing Culp's pay with any other Department employees.

After Culp arrived, Belton complained to Clemon that Culp was allowed to eat lunch at her desk, when Belton was not, and that Culp did not answer the phones, which meant Belton "would be stuck with

---

[9]     The defendants assert that Belton, without authority, requested that the UAB administration office fax a copy of the letter to the Department.  Belton denies requesting the fax, but claims she probably had seen it because she made copies of "everything" for Fowler.

them."[10]   Culp resigned after about a week on the job and cited the

disclosure of her confidential information as the primary reason for

her departure.   In her letter of resignation, Culp stated:

> I feel that for two weeks prior to my employment, my
> salary, qualifications, etc. were discussed, passed
> around, and the entire floor was made aware of matters
> that should **never** have been discussed.   My privacy was
> violated, and hostilities were beginning to fester before
> I ever walked into my office.

Culp also told Pass that Belton's conduct was her "major

complaint" and that Belton had been "on top of her" about her duties

or her salary since the day she came to work in the Department.

Pass felt that Culp had been a valuable employee and was distressed

that she had left because of Belton's conduct.   Pass further was

concerned that Belton could not be trusted with confidential

information in an office where the confidentiality of patient

records was of paramount importance.

Clemon organized Belton's employment history and presented it

to Pass, Orr, and Brian DePew, the UAHSF's Director of the People

---

[10]   This was the same meeting at which Belton complained
about the Orange Beach conference and accused Pass of improper
conduct towards Pinson.   Belton further complained that Fowler
was "playing games" with Pass.

Resource Center.  Pass, Orr, and DePew made the final decision to terminate Belton.  The reasons for the termination were set out in a memorandum detailing Belton's "lack of maturity and professionalism."  The memorandum notes Belton's:

(1)   Constant focus on other people and their jobs and their personal issues rather than doing her work and dealing with her job performance,

(2)   Assumption that she was responsible for other employees' daily tasks and making sure they did their work,

(3)   Communication of confidential salary information, and

(4)   Creating/suggesting inappropriate inferences regarding the working relationships ... between Dr. Pass and Dana Pinson.

Pass, Fowler, Orr, and DePew have testified that the knowledge of Belton's EEOC charge against UAB had no bearing on the decision to terminate her.

On April 9, 1997, Orr delivered a letter to Belton terminating her employment.  The letter referred to the issues raised in the January 29 meeting, and stated:

Since that time you have continued to foster an atmosphere of mistrust and tension.  Since there have been no improvements in your spirit of cooperation as

13

well as your continued efforts to foster negative working
relationships, this memorandum is to serve as
notification that your employment will be terminated
effective today's date.

After Belton's termination, UAB and UAHSF received notice that

the EEOC had dismissed Belton's charge of discrimination against

UAB.   UAHSF decided not to replace Belton, but to instead use

temporary help until an additional lab technologist could be hired.

Once the new technologist began work, the technologists shared

Belton's data entry responsibilities.  Similarly, employees in the

department absorbed Belton's remaining duties as a financial

assistant.  Less than a year after Belton was terminated, she was

declared totally disabled, and began to receive Social Security

benefits and Medicaid.

On July 3, 1997, Belton commenced this lawsuit against UAB,

asserting that UAB wrongfully denied her a permanent job and

wrongfully discharged her on the basis of race and in retaliation

for her filing an EEOC charge.  On October 30, 1998, she amended her

complaint to add UAHSF as a defendant and asserted two claims

against UAHSF, alleging that she was terminated because of her race

and in retaliation for having filed the EEOC charge.

14

In Belton's brief in opposition to the instant motions, Belton dismissed her race discrimination claims against both defendants. Consequently, her only remaining claim is that she was terminated by both UAB and UAHSF in retaliation for filing an EEOC charge against UAB and for complaining about Pass's selection of white employees for the Orange Beach conference.

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant

15

can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

16

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson,

17

477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).   Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).   Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

Plaintiff's retaliation claims arise from the April 9, 1997, termination of her employment with UAHSF.  While it is undisputed that UAHSF was Belton's employer, she also asserts a claim against UAB based on the theory that the two entities are joint employers.

18

She alleges that UAB and UAHSF are sufficiently interrelated to be perceived as a single employer for purposes of Title VII.

UAHSF bases its motion for summary judgment on the retaliatory discharge claim on three grounds: (1) that Belton's claims are not actionable under § 1981 because she was an at-will employee; (2) that Belton cannot establish a *prima facie* case of retaliation; and (3) that UAHSF terminated Belton for a legitimate, non-discriminatory reason.

As grounds for its motion for summary judgment, UAB first contends that UAB was not Belton's employer at the time she was terminated.  In addition, UAB adopts the arguments and evidentiary submissions of UAHSF.  Because the court finds (1) that Belton has failed to establish a *prima facie* case, and (2) that UAHSF's articulated legitimate, nondiscriminatory reason for the termination is not a pretext, the court assumes, without deciding, that UAB and UAHSF would be jointly liable.[11]

---

[11]     Because this case is due to be dismissed on other grounds, the court declines to address the complex arrangement between UAB and UAHSF, but notes that the issue is complicated by the fact that even though Belton clearly was a UAHSF employee when terminated, she reported to UAB employees, was evaluated and counseled by UAB employees, and spent half of her time on tasks that benefitted UAB.

### A.  Belton's § 1981 Claims

The defendants assert that Belton cannot sue under 42 U.S.C. § 1981 because as an at-will employee Belton does not have the requisite contractual relationship with UAB or UAHSF to trigger a right protected by § 1981.  The court agrees that Belton was an at-will employee under Alabama law who could be fired for a good reason, a bad reason, or for no reason at all.  However, defendants have not cited, and the court does not find, any binding precedent that would compel the conclusion that the at-will status precludes an employee from raising a claim under § 1981.

The Eleventh Circuit Court of Appeals noted that there is no Supreme Court or Eleventh Circuit precedent on point when it examined qualified immunity in a § 1981 employment discrimination case in Georgia.  Bishop v. Avera, 177 F.3d 1233, 1235 (1999). While the Eleventh Circuit declined to resolve the issue in Bishop, the court stated that the Supreme Court case of Patterson v. McLean Credit Union, 491 U.S. 164, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989), an important case in the development of the law regarding § 1981, appears to have involved an at-will employee to whom § 1981

20

was applied.[12]  Bishop, 177 F.3d at 1236, citing Patterson, 491 U.S. at 185.

The at-will status of Belton under Alabama law eliminates her right to sue for prospective relief, such as to enforce a right to employment for a specific duration, since Alabama law makes clear that the employer has the legal right to terminate her at any time. At the least, however, Belton had an implied contract to be paid at the agreed-upon rate in exchange for the time she spent working for the employer, just as would any other at-will employee.[13]  The court finds that this contractual relationship is sufficient to support her claim under § 1981 and, even if it were not, plaintiff's claim is timely filed and would be viable solely as a Title VII action. Consequently, the defendants are not entitled to summary judgment on this ground.

---

[12]     In Patterson, the Supreme Court applied § 1981 to plaintiff's claims, but held that the statute did not address discriminatory conduct that occurred after the making of the contract.  The Civil Rights Act of 1991, however, amended § 1981 to broaden the definition of "make and enforce contracts" to include "the enjoyment of all benefits, privileges, terms, and conditions" of the contract.  See Bishop, 177 F.3d at 1235-36 and n.6; see also  Patterson, 491 U.S. at 185,

[13]     Certainly, if UAHSF had failed to pay Belton for her last week of work, Belton would have a right, enforceable pursuant to § 1981, to bring her contract claim for unpaid wages.

**B. Belton's Prima Facie Case**

The defendants assert that plaintiff's claims are due to be dismissed because she has failed to establish a *prima facie* case of retaliation.   In order to survive a properly supported motion for summary judgment, the plaintiff in a Title VII retaliation case must establish a *prima facie* case by showing: (1) that she engaged in protected conduct and (2) suffered an adverse employment action, that was (3) causally linked to the protected expression.   Taylor v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999).   In addition, the plaintiff must show that her employer was aware of her participation in the protected activity when it took the adverse action.   Maniccia v. Brown, 171 F.3d 1364,1369 (11th Cir. 1999).   In this case, however, whether UAB and UAHSF were aware of Belton's protected activity is not disputed.

1.   Protected Conduct

The plaintiff claims that she engaged in a protected activity by asserting an EEOC charge against UAB in September of 1996.   The filing of an EEOC charge is a classic "protected activity," and meets the first requirement.   See id.   The plaintiff also asserts that she engaged in another protected activity when she lodged a

22

complaint with Clemon on March 11, 1997, about Pass's failure to staff the Orange Beach conference with any African American employees. However, it is well settled in the Eleventh Circuit that "[a] plaintiff engages in 'statutorily protected activity' when he or she protests an employer's conduct" so long as she demonstrates "'a good faith, reasonable belief' that the employer was engaged in unlawful employment practices." Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 (11th Cir. 1998), cert. denied, 525 U.S. 1000 (1998), quoting Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). Not only is it necessary that the plaintiff honestly believe that the conduct was unlawful, but that belief must be "objectively reasonable." Harper, 139 F.3d at 1388.

The plaintiff's complaint about the Orange Beach conference staffing falls short of this standard because the plaintiff admitted that she "doesn't know" why the three black employees she names were not chosen for the conference. Furthermore, she admits that one of the three black employees plaintiff named was not chosen because she was pregnant and unable to travel, not because of her race. In addition, there is no reason a reasonable juror could have expected the doctor to have chosen Belton for the conference, given that she

had less seniority than anyone in the Department and had accumulated a less than stellar performance record during her short tenure with the Department.   Moreover, it is undisputed that there also were white employees who were not selected to staff the conference. Consequently, the plaintiff has failed to demonstrate that she held a "good faith, reasonable belief" that the employer, in staffing the Orange Beach conference, engaged in an unlawful employment practice.[14]   Because Belton's belief that the staffing decision was discriminatory was not objectively reasonable, she cannot be deemed

---

[14]      In fact, Belton testified to the contrary about Pass, whom she accused of making the allegedly discriminatory decision:

    Q:   Have you ever heard Dr. Pass say anything that
         indicated he had a bias against African-Americans?
    A:   No, not to my knowledge.
    Q:   Has anybody ever reported to you that they heard him
         say something or that they saw him do something that
         indicated such a bias?
    A:   No.
    Q:   Have you ever seen him do anything that made you think
         he didn't like African-Americans?
    A:   No.

24

to have engaged in statutorily protected conduct.[15]   See Clover v.
Total Systems Servs. Inc., 176 F.3d 1346, 1352 (11th Cir. 1999).


### 2.   Adverse Employment Action

There is no dispute that the plaintiff has shown that she was
fired from her position in the Department.   Consequently, she has
shown that she suffered an adverse employment action sufficient to
meet the second element of her claim.   See, e.g., Olmsted v. Taco
Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).


### 3.   Causal Link

The plaintiff in a retaliation case under Title VII must show
that there is some causal relation between the act of opposing
discrimination and the adverse employment action.   Olmsted v. Taco

---

[15]   Even if the opposition to the staffing decision were
"objectively reasonable," and therefore did constitute a
protected activity, Belton still would be subject to summary
adjudication because UAHSF would, at worst, have a "mixed motive"
in firing Belton.   In a mixed motive case, the employer still may
prevail if its legitimate reason for the firing, standing alone,
would have induced it to make the same decision.   As is discussed
in Section III C infra, Belton's conduct with respect to Culp's
salary, standing alone, would have induced UAHSF to make the same
decision.   Burrell v. Board of Trustees of Ga. Military Coll.,
125 F.3d 1390, 1395 (11th Cir. 1997), cert. denied, 507 U.S. 1018
(1993).

Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Id. at 1460, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).  However, to meet even this low threshold of proof of causation, the plaintiff must offer some evidence from which a jury could infer that the filing of the EEOC charge caused the termination.  It is this third element of the *prima facie* case on which the plaintiff fails to meet her burden, and there are three independent reasons why she has failed to demonstrate that the filing of the EEOC charge caused UAHSF to fire her.

First, the termination occurred seven months after the plaintiff engaged in the protected activity of filing the EEOC charge.  Such an attenuated temporal relationship generally belies the assertion of causation.  See, e.g., Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999), and cases cited therein.  Seven months elapsed between the time that Belton filed her EEOC charge and the time UAHSF terminated her, during which UAHSF had meetings with the plaintiff, responded to her suggestions and complaints, set goals

for her to meet, and recognized some limited improvement in some areas of her job performance.   These facts suggest that there is no causal link between the EEOC charge and the termination.

In addition, those who made the decision to terminate Belton have testified that her actions in opposing what she has complained of as racial discrimination played no role in the decision. Belton's problems within the Department began very shortly after she was hired and are well documented.   UAHSF noted that Belton repeatedly made errors in filing, had difficulty following directions, and engaged in unprofessional conduct.   Furthermore, Belton's problems worsened over time, until what defendants describe as the "culminating event," when Belton's alleged disclosure[16] of salary information caused Culp to resign from her job.   Pass has testified that the conduct involving Culp, standing alone, was sufficient to cause UAHSF to fire her because the disclosure of the information caused Pass to believe that Belton could not be trusted with confidential information.   Both Belton's termination letter and the numerous memos documenting meetings and counseling sessions with

---

[16]     The court recognizes that Belton disputes having disclosed Culp's salary.   However, the issue turns not on whether Belton actually engaged in the conduct, but merely whether the employer had reason to believe she did and actually based its decision on that belief, not on a discriminatory reason.

Belton support the conclusion that Belton's lackluster performance and unprofessional conduct, not her EEOC charge, caused her termination.  Belton has offered no evidence to the contrary.

In this case there is a third piece of evidence that weighs heavily against a finding of causation.  It is undisputed that both UAB and UAHSF knew, at the time that Belton was hired, that she had filed the EEOC charge.  More specifically, Fowler, who was one of the two supervisors who interviewed Belton, knew about her EEOC charge when she hired her.  It was Fowler who first recommended that Belton be terminated, although that recommendation was not followed at that time.  It strains the imagination to find an explanation for why an employer would hire an applicant, knowing she had filed an EEOC charge, and then fire her seven months later for the same conduct.  Instead of creating an inference of causation, this fact "give[s] rise to a permissible inference" that there was no discriminatory motive behind the firing.  Williams v. Vitro Services. Corp., 144 F.3d 1438, 1443 (11th Cir. 1998).

Like the plaintiff in Maniccia, 171 F.3d at 1370, Belton has failed to show causation in any manner other than by showing that she filed an EEOC charge and was terminated many months later.  To survive summary judgment, a plaintiff must show more than "mere

28

curious timing coupled with speculative theories." _Raney v. Vinson_ _Guard Serv. Inc._, 120 F.3d 1192, 1197 (11th Cir. 1997), citing _Goldsmith v. City of Atmore_, 996 F.2d 1155, 1163 (11th Cir. 1993). Summary judgment cannot be avoided by arguments "based on hunches unsupported with significant probative evidence." _Raney_, 120 F.3d at 1198. Plaintiff has failed to provide "significant probative evidence" of causation; therefore, she cannot establish a _prima facie_ case, and the defendants' motion for summary judgment is due to be granted.

### C. The Employers' Legitimate, Nondiscriminatory Reason

Even if the plaintiff had succeeded in establishing a _prima facie_ case, the presumption of discrimination may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action.   Once the employer meets its burden of articulating a non-discriminatory reason, the burden shifts back to the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proferred reason. _Combs v._ _Plantation Patterns_, 106 F.3d 1519, 1528 (11th Cir. 1997), _cert._ _denied_, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

29

Because UAHSF has offered a nondiscriminatory reason for the termination, Belton must, in order to overcome the motion for summary judgment, demonstrate by competent, admissible evidence that UAHSF's nondiscriminatory reason is merely a pretext. She must show not only that UAHSF's articulated reason is false, but also that UAHSF's true reason for firing her was retaliation. See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993). It is not the duty of this court to evaluate whether the decision to fire Belton was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes. See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

The plaintiff attempts to show that the proffered reason is a sham essentially by pointing to the same evidence she claims supports causation. Belton has asserted that because she received a "satisfactory" rating on her evaluation, and because Alosi and Fowler had stated that she showed some improvement in her work during February, UAHSF's articulated reason must be a pretext. Belton ignores, however, the fact that UAHSF has stated that the reason for her termination was not solely based on her lack of job

30

skills, but was primarily based on her unprofessional conduct.[17]
Consequently, the evidence that her job skills improved does not
refute UAHSF's contention that Belton was "unsuited" for her
position and was terminated because of the continuous problems noted
in her performance, attitude, and professionalism.   In fact,
Belton's termination letter reflects that the reason for her
termination was her lack of a "spirit of cooperation" and her
"continued efforts to foster negative working relationships."  This
supports, rather than refutes, the articulated reason and leads to
an inference that Culp's resignation was the "culminating event"
that led to Belton's termination.   In addition, Pass has testified
that he considered the incident involving Culp, standing alone, as
sufficient reason to terminate Belton.

Belton merely conjectures that UAHSF's real reason for firing
her was to retaliate.  She makes numerous conclusory statements to

---

[17]     Belton argues that the firing was a result of Belton's
conduct in lodging a complaint about Pass's failure to staff the
Orange Beach conference with any African-American employees, and
supports that argument with a reference to Orr's deposition.
However, a closer look at Orr's testimony reveals that he
provided the plaintiff with a lengthy laundry list of conduct
that evidenced Belton's "focus on other employees and issues
generating tension."  Orr further described Belton as a
probationary employee who was "taking a lot of time to manage and
work with."

31

that effect in her brief in opposition to the motions for summary judgment; however, no fact in evidence logically calls into question the credibility of the articulated nondiscriminatory reason. Belton's speculation is not sufficient to overcome the defendants' well-supported motion for summary judgment.

The court's job is to consider whether the evidence "presents a sufficient disagreement to require submission to a jury." <u>Combs</u>, 106 F.3d at 1526. The court finds little or no support for Belton's argument that the reason is a pretext. Furthermore, in light of the serious nature of the incident involving Culp, and in light of the past concerns about Belton's performance, the evidence is so one-sided that the defendants must prevail.

In sum, the evidence shows that Belton, at her best, was only marginally proficient at her duties. In addition, she proved to require an excessive amount of attention and supervision as a result of her frequent complaints about such minor concerns as the time of her lunch break. Furthermore, even after being warned, she refused to cooperate with others and to foster more friendly relationships with her co-workers. Finally, she failed to respect the confidentiality of sensitive information and generally "stirred up trouble." Consequently, the court finds that Belton has failed to

meet her secondary burden of showing that UAHSF's stated reason for dismissing Belton was pretextual, and Belton's claim of retaliation is subject to summary judgment in favor of both defendants under the burden-shifting test as adopted by the Eleventh Circuit.

## IV.   CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented by defendants in support of the motions for summary judgment, and in light of the plaintiffs' failure to meet her burden of coming forward with evidence sufficient to create a genuine issue of material fact, this court determines that defendants' motions for summary judgment against plaintiff are due to be GRANTED and plaintiffs' claims are due to be DISMISSED WITH PREJUDICE.

A separate order will be entered in accordance with the findings set forth herein.

DATED this 21st day of April , 2000.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE